Booth, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
This case comes to the court under special jurisdictional acts. This suit is one by various claimants to recover for services rendered and expenses incurred in securing Mississippi Choctaw Indians the right of citizenship in the Choctaw tribe. The whole controversy extends over a long period of years, is much involved, and the statement of the case must be extracted from a most voluminous record of hundreds of pages of printed testimony, which, together with the briefs of counsel, make up ten printed volumes of considerable size.
The native habitat of the Choctaw Indians was in the South, principally in what is now the State of Mississippi. On September 27, 1880, the United States concluded with the Indians what is known as the “Dancing Babbit Creek treaty,” 7 Stat. L., 338. The principal intent, indeed, the lasting benefit, to be secured to the United States by the *287 terms of the treaty was the removal of the main body of the tribe to Indian Territory. This was to be accomplished by an interchange of landed estates, the Indians relinquishing all title to their eastern possessions for a reservation in the West. In a spirit of evident compromise, and as an inducement for the final consummation of the undertaking, the Indians, always loath to depart from their native lands and surroundings, secured a reservation in the stipulations of the instrument which in the end gave birth to this litigation.
Article 14 of the Dancing Rabbit Creek treaty provided a method by which such Choctaws as chose to avail themselves of the provision might remain in the east and become citizens of the States wherein they resided. Those who did so were to be allotted a certain acreage of land varying in extent according to the number of children in the family. Upon these various allotments a residence of five years was an indispensable condition precedent to the acquirement of a fee-simple title; and it was expressly set forth that all Indians remaining in the State should be considered as intending to become citizens thereof. The final clause of article 14 created the condition which not only occupied the attention of Congress and the Indian Office for many years, but also erected the issue for the settlement of which all the claimants herein claim some compensation. It is in the following language:
“ Persons who claim under this article shall not lose the privilege of a Choctaw citizen, but if they ever remove they are not to be entitled to any portion of the Choctaw annuity.”
The number of Indians remaining in Mississippi after the emigration of the tribe is indeterminate. Those that did so remain adopted the habits, customs, and dress of the white inhabitants of the State; all tribal laws were abolished; all Indian communal association was discontinued; and they were absorbed into the body politic of their respective communities. The Government assumed no jurisdiction over them and the Congress made no appropriations for them. They were treated, in so far as the United States was concerned, as citizens of the State of Mississippi and of the United States. The State of Mississippi also recognized *288 by positive legislation their status as citizens of the State. The State Legislature by an act passed January 19, 1830, abolished all Indian tribal relations and laws theretofore prevailing among the Indians and made them citizens of the State. This legislation was ratified by the constitution of 1832, reenacted in 1840, and carried into the Mississippi Code of 1848.
All doubt as to their civil and political status, which is an important fact in this case, was finally removed by the sixth section of the act of February 8, 1887, 24 Stat. L., 390, which conferred citizenship upon all Indians living apart from their tribe and who have adopted the habits, etc., of the white man with intent to become citizens of the United States. The act of 1887 was amended by the act of March 3, 1901, 31 Stat. L., 1447, extending citizenship to Indians in Indian Territory.
The Choctaw Nation of Indians west for many years after their removal to Indian Territory never contested nor even questioned the right of the fourteenth article Mississippi Choctaws to citizenship in the parent tribe. On two different occasions they manifested a positive desire to have their eastern brethren join them in the west, extending to them the privileges of the treaty. In 1889 they memorialized Congress to provide funds for the removal of large numbers of Mississippi Choctaws to their western reservation, and in 1891, by council action, the nation itself appointed a commission and provided funds for their removal, on which occasion at least 181 Indians were removed. There is not in the record a single suggestion of opposition to the treaty rights of the Mississippi Choctaws until some time after the year 1893, when the Government inaugurated, through the Dawes Commission, an extensive inquiry among and negotiation with all the Indian tribes in Indian Territory with the avowed intention of allotting all their lands to them in severalty, distributing their Indian funds, and otherwise discontinuing the long-time relationship of guardian and ward.
Notwithstanding this legislation no violent opposition developed upon the part of the nation west until it became apparent that thousands of mixed-blood Choctaws not resi *289 dents of Mississippi were seeking enrollment under that legislation. The Choctaw Nation in fact never interposed objection to the enrollment of his eastern brother of the full blood claiming rights under the treaty of 1830, if they in good faith removed to the Territory, until largely through the efforts and constant agitation of the parties claiming here, an attempt was made to procure legislation extending the right of citizenship to these claimant Indians, which would in the aggregate increase their rolls to the extent of 25,000 or 30,000 Indians, including thousands of mixed-blood Choctaws who resided elsewhere than in Mississippi. A ceaseless and persistent effort was made by the claimants herein, not only to procure legislation according these general rights, but at the same time vigorously contesting the requirement of removal to the Territory in any event. This alone prolonged and delayed the rights subsequently accorded the present beneficiaries by Congress.
The Dawes Commission was established by the act of March 3, 1893, 27 Stat. L., 645. It made a very comprehensive report of its proceedings to Congress, and on June 10, 1896, Congress directed the commission to make a roll of the Five Civilized Tribes, and provided that all applicants for enrollment should file their applications with the commission within three months from the passage of this act, with right of appeal to the United States courts.
This legislation was the signal for all the activity thereafter manifested upon the part of all the claimants in behalf of the Mississippi Choctaws. The legislation on its face indicated the conclusion of Indian claims in both funds and lands to the tribal property of the Five Civilized Tribes, of which the Choctaws were one. It was likewise the inspiring cause for persistent opposition to the rights of Mississippi Choctaws under the fourteenth article of the treaty of Dancing Eabbit Creek. It became at once apparent that the admittance of a large body of Mississippi Choctaws to participation in the allotment of the Choctaw lands would proportionately decrease the individual allotment to each member of the western tribe already enrolled, and thus materially diminish the value of their entire estate. The western In *290 dian renounced his former affection for his eastern brother and, reversing the earlier policy of the western tribe, interposed objections to his unqualified citizenship.
The usual Indian controversy arose and innumerable objections and counter-objections predicated upon degree of Indian blood and Indian ancestry, supplemented by arguments pro and con as to the necessity of removal to the Indian Territory on the part of the Mississippi Choctaws, prolonged the settlement of treaty rights and projected the consideration of the whole question through several sessions of Congress. The review of the legislation is quite tedious but indispensable.
Early in 1896 the attention of Congressman (now United States Senator) John Sharp Williams, of Mississippi, within whose district the major number of Choctaw Indians resided, was directed to the rights of his constituents under the fourteenth article of the treaty of Dancing Rabbit Creek. Senator Williams immediately became active; he investigated the subject with great diligence; acquired valuable information from the Interior Department, and prepared, in conjunction with his Mississippi colleagues and other Senators and Congressmen interested in Indian affairs and the Interior Department, many and effective bills and amendments to bills for consideration by Congress, some of which were subsequently enacted into law.
The first of these was a provision inserted in the Indian appropriation act of June 7, 1897, 30 Stat. L., 83, directing the Dawes Commission to investigate and report to Congress whether the Mississippi Choctaw Indians are not entitled to all the rights of Choctaw citizenship under their treaties except interest in the Choctaw annuities.
The commission reported that in view of a decision of the United States Court in Indian Territory requiring the removal to Indian Territory of all Mississippi Choctaw Indians before any right of enrollment accrued, and in view of the debatable question as to tracing ancestry to some person who originally availed himself of the provisions of the Dancing Rabbit Creek treaty, together with the absence of any legal authority on its part to receive additional applications because the date of limitation therefor had expired, *291 it recommended the submission of the whole question to the United States Court of Claims.
In June, 1898, the following Congress, by the twenty-first section of what is known as the Curtis Act, removed the obstructions in the way of the Dawes Commission in the consideration of Mississippi Choctaw claims, under the fourteenth article of the Dancing Babbit Creek treaty, and gave the commission full power and authority to determine the identity of all the Mississippi Choctaw claimants. This legislation restricted the right of citizenship to such Mississippi Choctaws as had theretofore removed to the Territory, reserving to Mississippi Choctaws, however, all rights they might have theretofore acquired under any Indian treaty or law of the United States.
On December 2, 1898, the Dawes Commission caused to be printed and extensively circulated among the Mississippi Choctaws in Mississippi and elsewhere a circular informing them of their rights under the Curtis Act, notifying them of the time and place where the commission would sit to receive applications, and giving in detail the exact manner of procedure necessary to procure identification. In pursuance of the public notices given as aforesaid, one of the commissioners, Mr. A. S. McKennon, visited Mississippi, filled various appointments previously made to meet the Indians, and completed a schedule of 1,923 persons whom he thought entitled to citizenship. The “ McKennon roll ” was constructed upon the theory of according citizenship to all full-blood Mississippi Choctaws whose ancestors were living in Mississippi at the date of the treaty of 1830. The roll was approved by the Dawes Commission, but was later on withdrawn, as it had not met the approval of the Secretary of the Interior, he in fact subsequently disapproving it entirely.
A second commission was dispatched to Mississippi in December, 1900, by the Dawes Commission. The manifest errors and omissions of the McKennon roll made it imperative. This commission held public meetings at Hattiesburg, Meridian, and other places in Mississippi, and continued in session until August, 1901, sometimes at one place and then at another.
*292 On May 31, 1900, 31 Stat. L., 236, Congress further extended the right of enrollment to Mississippi Choctaw Indians duly identified for citizenship in the Choctaw Nation to any time prior to the approval of the final Choctaw rolls then in process of completion by the Dawes Commission, and if such identified Indians made bona fide settlement in the Choctaw country previous to said date the commission was directed to enroll them. This was in effect a substantial extension of time for removal to the Territory. This same act expressly invalidated all contracts or agreements which in any maimer provided for the sale or encumbrance of the Indians’ allotments, a most significant provision and extremely important in the consideration of this case.
For some reason not apparent upon the face of the statute the Dawes Commission invoked a species of technical refinements and in its quasi judicial capacity construed the act of May 31,1900, as prospective in its operation and required all applicants thereunder to trace their ancestry to Mississippi Choctaw Indians who remained in Mississippi and received patents for lands under the fourteenth article of the Dancing Rabbit Creek treaty. It was a most restricted ruling and resulted in the enrollment of but six or seven persons out of from 6,000 to 8,000 applicants.
An attempt was made in February, 1901, to compose the differences as to enrollment by an express agreement between the Dawes Commission and the Choctaw Nation of Indians. The contract, though executed, failed of congressional approval. It was followed, however, by the agreement of March 21, 1902, which, with ,the amendments thereafter adopted by Congress and later ratified by the Choctaw Nation, concluded in all substantial respects the rights of the Mississippi Choctaws to citizenship in the western tribe. This contract, as amended and subsequently approved by Congress by the act of July 1,1902, is known as the Choctaw-Chickasaw supplemental agreement, and closed in all important particulars this long and somewhat furious contest. In the end, by virtue of this agreement, Mississippi Choctaw Indians identified under the provisions of section 21 of the act of June 28,1898 (Curtis Act), might at any time within *293 six months after the date of their identification by .the commission make bona fide settlement within the Choctaw country, and upon proof of the same within one year after the date of identification should be enrolled as a Mississippi Choctaw, and upon approval of the rolls by the Secretary of the Interior became entitled to the same rights, privileges, and allotments of lands as the members of the Choctaw Nation. No application was to be received after six months from the passage of the act, and the commission was specifically directed to enroll “ all full-blood Mississippi Choctaw Indians and descendants of any Mississippi Choctaw Indians, whether of full or mixed blood, who received a patent of land under the said fourteenth article of said treaty of 1830 who had not moved to and made bona fide settlement in the Choctaw-Chickasaw country prior to June 28, 1898.” All the aforesaid Mississippi Choctaw Indians were to be carried upon a separate roll.
In 1903, 32 Stat. L., 982, Congress appropriated $20,000 to be expended under the direction of the Secretary of the Interior in removing indigent and identified full-blood Mississippi Choctaws to the Territory. This appropriation was expended in the removal of 420 Indians by special train and their subsequent subsistence, together with the purchase of tools and farming implements for them, until placed upon their individual allotments.
The final disposition of all Choctaw matters was provided for in the legislation of April 26, 1906, 34 Stat. L., 127, providing for enrollment of the minors and descendants of deceased Indians and covering certain contingencies arising from death of a duly enrolled Indian.
The astounding number of 26,000 persons applied for enrollment as Mississippi Choctaws. The commission rejected all applications except 2,534, and 956 of these failed of allotment because they furnished no proof of removal or settlement in the Indian country; 1,578 persons were finally enrolled and received allotments as members of the Choctaw Nation, having furnished proof of removal to the Territory and otherwise complied with the requirements of the law.
*294 The course of all the above legislation and the rights and privileges secured thereby is of paramount importance in this case. The alleged services rendered by attorneys in a professional capacity and the sums expended by others not lawyers in securing the benefits alleged to have been derived by the same constitute the gravamen of the complaint herein and become the critical inquiry in the case.
Twenty-five claimants prefer individual and partnership claims against the Mississippi Choctaw Indians for participating in all the detailed proceedings above set forth, varying in amount from $5,000 to 15 per centum of $16,000,000, an alleged conservative estimate of the value of the landed estate recovered for the fortunate ones finally enrolled. Eight of the 25 claimants secured at one, time and another 3,224 contracts with individual Indians. These are contracts of employment and representation, and most generally provided for the generous compensation of one-half the value of all the benefits finally accruing to the obligee. The remaining claimants rest their cause of action upon assignments of some of the contracts taken by their colaborers or special employment by the parties having contracts with the Indians. Of course all the claimants are now insisting upon rights under the special jurisdictional acts, and the detailed history of each claim will be adverted to hereafter.
Before adverting to the jurisdictional question raised by the defendants, it is quite necessary to state briefly the surroundings and the physical and mental status of the Mississippi Choctaw Indians from 1830 forward. As appears from the findings they were extremely poor, lived under insanitary conditions, earning their livelihood as best they could by manual labor; their children did not attend the schools provided for the whites, and the extent of their illiteracy is more than manifest from the fact that a great majority of them executed their contracts with claimants by mark. They were childishly unsophisticated, had absolutely no conception of their property rights or any well-considered ideas as to what they should pay to secure them. It was no task to secure their assent to almost any proposition, evidenced by the fact that as a general thing they manifested no com *295 punctions of conscience in duplication of express agreements, and hesitated in acting as frequently as contrary advice was offered. These statements are all deductible from .the record. It is almost incomprehensible to believe otherwise when it positively appears that with apparent ease individual contracts were obtained from these Indians providing for an absolute grant of one-half of their total estate in the event of success, and in such numbers that even the minimum number obtained by one representative would represent a fortune. Attorneys at law, farmers, merchants, bankers, a preacher, and others without any settled vocation in life, were potentially equal before “ these remnants of a once powerful tribe,” and experienced no difficulty in procuring contracts of employment to represent them.
The defendants challenge the jurisdiction of the court, resting a most vigorous contention upon individual contractual liability, asserting the cause of action to be between adverse parties with complete and adequate remedy in the local courts; that the jurisdictional acts simply afford a forum for the adjudication of the claims without in any way changing their real or legal status or imposing liability upon the defendant Indians. The express provisions of the jurisdictional acts are emphasized in support of this contention, and the status of the claim as it appears from the record is cited as a convincing proof that the litigation is between citizens.
There were two jurisdictional acts—one enacted April 26, 1906, 34 Stat. L., 140, the other May 29, 1908, 35 Stat. L., 457. The verbiage of the two statutes in the enacting part is similar in all substantial respects, the later one being expressly designed to admit the prosecution of additional claims by other claimants. It is the directory clauses of the two acts that differ in important particulars, especially as to the manner of enforcing any judgment the court may render. In order to facilitate an intelligent consideration of their provisions we exhibit here the two statutes:
“ That the Court of Claims is hereby authorized and directed to hear, consider, and adjudicate the claims against the Mississippi Choctaws of the estate of Charles F. Winton, deceased, his associates and assigns, for services rendered *296 and expenses incurred in the matter of- the claim of the Mississippi Choctaws to citizenship in the Choctaw Nation, and to render judgment thereon on the principle of quantum meruit in such amount or amounts as may appear equitable or justly due therefor, which judgment, if any, shall be paid from funds now or hereafter due such Choctaws by the United States. Notice of such suit shall be served on the governor of the Choctaw Nation, and the Attorney General shall appear and defend the said suit on behalf of said Choctaws.”
The jurisdictional act was amended by an act approved May 29,1908, 35 Stat., 457, which provides:
“That the Court of Claims is hereby authorized and directed to hear, consider, and adjudicate the claims against the Mississippi Choctaws of William N. Vernon, J. S. Bounds, and Chester Howe, their associates or assigns, for services rendered and expenses incurred in the matter of the claims of the Mississippi Choctaws to citizenship in the Choctaw Nation, and to render judgment thereon on the principle of quantum, meruit in such amount or amounts as may appear equitably and just due therefore, which judgment, if any, shall be paid from funds now or hereafter due such Choctaws as individuals by the United States. The said William N. Vernon, J. S. Bounds, and Chester Howe are hereby authorized to intervene in the suit instituted in said court under the provisions of section nine of the act of April twenty-sixth, nineteen hundred and six, in behalf of the estate of Charles W. Winton, deceased: Provided, That the evidence of the interveners shall be immediately submitted: And provided further, That the lands allotted to the said Mississippi Choctaws are hereby declared subject to a lien to the extent of the claims of the said Winton and of the other plaintiffs authorized by Congress to sue the said defendants, subject to the final judgment of the Court of Claims in the said case. Notice of such suit or intervention shall be served on the governor of the Choctaw Nation, and the Attorney General shall appear and defend the said suit on behalf of the said Choctaws.”
Under the first act the claimant Winton and his associates filed their petition October 11,1906, later amending the same after the passage of the act of May 29, 1908. All the other claimants came in under the last act.
The statutes are in pari materia, the additional remedies as to enforcement of judgment in the later one being made expressly applicable to the earlier claimants.
*297 An analysis of the findings, which discloses the proceedings taken by the various claimants under this jurisdiction, demonstrates beyond peradventure the relationship originally obtaining between the claimants, and defendants and fixes by the acts of the parties themselves what in the absence of some positive law to the contrary would be their respective liabilities under the common law. The jurisdictional act in the first clause refers expressly to two claims— first, the claims of the persons mentioned therein for services rendered and expenses incurred in the matter of the second claim, viz: The Mississippi Choctaws to citizenship in the Choctaw Nation. We have discussed at length the origin and development of the claims of the Mississsippi Choctaws to citizenship in the old nation, leaving now only the additional observation that the services to be rendered in connection with said claim were legislative services of a professional character, and the alleged expenses incurred, in so far as removal of the Indians is concerned, could not accrue until the legislation admitted of their existence. What then is the claim referred ? It is and must be conceded that the jurisdictional act creates no liability against the defendant Indians or the United States. Its function is restricted to the right to sue in a judicial tribunal vested with authority to determine from the controverted questions of law and fact whether under the law the claimants have a legal demand for compensation from the defendants. Green v. Menominee Tribe, 233 U. S., 558.
The defendant Indian in this case never in a single instance, so far as the record shows, solicited one of the various claimants to appear for him professionally or expend a dollar in his behalf. The solicitation was wholly from the claimants. Various ones among them visited the Indian in his Mississippi home and procured by personal contact with him individual contracts to represent him—not a band, tribe, or nation of Indians, but individual citizens of Indian blood, agreeing in writing to pay a certain sum upon the happening of a certain contingency, and not infrequently granting interest in individual property to be acquired as security for the Indian’s performance of his obligation under the contract. They were not only in fact contracts for personal *298 services to be rendered each individual; they were more; they were powers of attorney authorizing substitution of persons other than the named agent to act; they provided for the employment of additional agents and solicitors. The scope of authority obtained by the agent or attorney under these individual contracts was extensive and plenary; no detail had been omitted which might suggest itself to the skilled lawyer or trained claim agent. That this contractual relationship sought by and intended to be created by the claimants was the initial proceeding for binding the defendants in law to the payment of large sums of money is more than manifest by the extensive field of territory covered in the haste to procure individual contracts and the sums expended in their procurement. Numerous contracts were assigned and large sums of money realized therefrom. Companies were incorporated with no other assets save these assigned contracts.
To effectuate the contentions of the defendants with respect to the jurisdictional issue, however, the court must find from the record in the case that notwithstanding the individual contractual relationship the claimants have no justiciable claim. The jurisdictional act refers a claim and if from the record it is ascertainable that a legal demand has been proven to exist, it can not be dismissed simply because its origin was consummated in written agreements for which the jurisdictional act affords no remedy. It is quite possible for a court to render judgment upon the basis of quantum meruit, although the transaction in its inception arose from express agreements fixing specific compensations, especially so where it is within the power of the legislative body granting jurisdiction to prescribe the conditions upon which the defendants may be sued.
That Congress possesses plenary authority over Indian lands and Indians when dealing with respect thereto is not to be denied. From the decision of the case of Lone Wolf v. Hitchcock, 187 U. S., 553, down to the recent case of Tiger v. Western Investment Co., 221 U. S., 286, this principle has been repeatedly affirmed. The last case cited is a very exhaustive opinion covering every phase of the controversy such as suggested here. There can be no room for argument *299 in view of the number of adjudicated cases that the grant of citizenship to the individual Indian is not inconsistent with governmental control and supervision of Indian property or the exercise of governmental jurisdiction over the Indian in respect to his dealings with said property.
Congress by the jurisdictional acts referred to this court the claim of the petitioners and intervenors, and if from the record the court can find the existence of a legal relationship that warrants the rendering of a judgment upon the principles of quantum meruit the consequential liability attaches. Congress has ample authority to charge the Indian lands involved in this case with the payment for services rendered or expenses incurred in securing to the Indians this estate, and the wisdom of their action is not subject to judicial review. Bailey v. Osage Indians, 43 C. Cls., 353; Butler & Vale v. United States, 43 C. Cls., 497; Sac & Fox Indians v. United States, 45 C. Cls., 287; 220 U. S., 481; Mille Lac Indians, 46 C. Cls., 424 ; 229 U. S., 498.
It in no wise militates against this contention that the jurisdictional acts provide for a judgment enforceable against funds due the Mississippi Choctaw Indian as an individual by the United States or creates a lien upon his individual allotment. Congress is dealing with Indian tribal lands, and it can limit, prescribe, and impose such conditions and limitations with respect thereto as in its wisdom seems just and equitable. Heckman v. United States, 224 U. S., 413. In this case the court said:
“ Its efficacy does not depend upon the Indians’ acquiescence. It does not rest upon convention, nor is it circumscribed by rules that govern private relations. It is a representation which traces its source to the plenary control of Congress in legislating for the protection of the Indians under its care, and it recognizes no limitations that are inconsistent with the discharge of the national duty.”
While it is true that the Heckman case was a suit to set aside conveyances and recover for the Indian lands disposed of, still the fundamental principle obtains that Congress may in its discretion administer the Indian property as to it seems just and equitable to the Indian and the white man dealing with him.
*300 On the argument of the case the court experienced some doubt upon the question of jurisdiction, but this doubt has been removed by an examination of the authorities cited. The jurisdictional acts are subject to a practical as well as technical construction. The intention of Congress must prevail, and that intention is manifest from the language of the acts when the situation of the claimants with respect to the subject matter is kept in view. Congress by the act of May, 1900, had invalidated all contracts looking toward a sale or encumbrance of the allottees’ lands. Whether in any event the contracts invalidated or those not invalidated were enforceable against an individual Indian is far from certain. One thing is sure, however, they never could have been made the basis of any suit wherein a judgment rendered thereon could become enforceable against the Indian property. Congress observed the situation of affairs and by the jurisdictional acts referred to this court the question of a legal claim against their wards for compensation upon the principles of quantum meruit.
The case of Green v. Menominee Indians, supra, is not contrary to this holding. The acts are in no wise similar. The service rendered is quite distinct. In the Green case supplies furnished the individual Indian were to be paid for by an arrangement which brought the Indian’s funds into the hands of a third party; for some reason the written arrangement miscarried, and it was sought to impose the failure upon the Indians. Here we have an Indian fund and an Indian estate carried upon the rolls of the departments in the name of the Missisippi Choctaws as a class—a fund and an estate which was the result of negotiation and legislation alleged to have been successfully terminated by the services of the petitioners, and over which Congress has absolute and plenary power in its administration.
Whether this court can render a judgment upon the principles of quantum meruit is quite another matter which necessarily depends upon the proof in each individual case. The claim in suit, as we view it, is an assertion of liability emanating from the performance of service under an express contract, a service performed, a contract executed, an agree *301 ment where the plaintiffs have done all they agreed to do under the express agreements, and nothing remains except to pay them therefor. The agreements themselves being invalidated, the service having been performed with the knowledge and consent of the defendants and from which they derived and have accepted benefits, the law implies an obligation to pay what such services are reasonably worth. It has been uniformly held in the cases heretofore cited that jurisdictional acts, similar in most respects to the ones here under consideration, create no liability under the express agreements, the court discarding them in so far as they stipulate for the payment of compensation, leaving for our consideration the determination of the question whether the transaction in all its aspects, taking into consideration the situation of the parties, is one which from the proof satisfies the court that the claimants performed the services claimed for, resulting in benefit to the defendants under such circumstances that the law will imply a correlative obligation to compensate them therefor. The contracts are admissible in evidence, both to establish knowledge upon the part of the defendants and as evidence of what might constitute a reasonable award for the work done. This is what the court understands Congress to mean when it directs a judgment upon the principle of quantum meruit (9 Cyc., 686).
Congress does not by the legislation create the situation necessary to be supplied by proof before the court can act. It affords to the claimants a forum where the burden rests upon them to bring in a record of sufficient strength to sustain a recovery upon the legal principles provided by Congress as the court’s guide.
The judgment, if any, to be awarded is not an individual one. Proof of service to an individual Indian is not sufficient to recover. Congress was not assuming jurisdiction over individual Mississippi Choctaw Indians as Indian citizens, for if such had been the intent his individual right to be heard in defense would not have been, if it could be, denied him. The jurisdictional acts comprehend service to the Mississippi Choctaw Indians as a class, and under their terms the proof must establish a service that extended alike to all the Missis *302 sippi Choctaws enrolled as such on the rolls of the old nation. In the language of the jurisdictional acts, it must appear that the service was rendered in connection with and for the avowed purpose of legalizing “the claim of the Mississippi Choctaws to citizenship in the Choctaw Nation.” Incidental work and labor performed for the benefit of individual Indians, no matter how extensive, was not within the contemplation of Congress when a charge was laid against the Indian defendants’ lands and funds, unless it can trace unmistakable benefits accruing alike to each and all of the 1,613 Mississippi Choctaw Indians finally enrolled in the nation and allotted lands under the law.
The matter of the claim of Mississippi Choctaws to citizenship in the Choctaw Nation was a legal controversy between the two Indian parties as to the construction of the fourteenth article of the Treaty of Dancing Rabbit Creek. The determination of this issue must in the first instance rest with Congress. It could not have been the subject of judicial consideration in the absence of legislation. The appeal to Congress brought legislative relief and citizenship was accorded the Mississippi Choctaws. The right to citizenship in the nation was made clear and unambiguous in the respective laws upon the subject, and here the claim itself, in its legal aspect, the real controversy requiring service, the final solution of what rights were reserved to the southern Indians under the disputed article of the treaty, ended. Thereafter it became a personal matter; if the Indian chose to avail himself of the right, the way was open; if he did not, it was a matter of personal judgment. This is plainly substantiated by the failure of nearly 1,000 beneficiaries already identified to remove to the Territory and acquire property.
At some future date the Congress may deem it just and equitable to relieve these Indians identified but not allotted because of failure to remove to the Territory, and by legislation removing the limitation as to time grant them the full rights and privileges accorded the Indians against whom this claim is made. In that event are we to presume the defendant Indians here impleaded are to bear the full cost *303 and expense of procuring a privilege which in the end inures alike to their belated brethren, thus penalizing the diligent and rewarding the negligent ? Legislation of this character is now pending in Congress and is earnestly urged.
The Congress, it is true, in the legislation which accorded this right, imposed upon the individual Indian applicant the performance of certain conditions precedent to its acquirement—viz, removal to the Indian Territory and residence therein, etc., for a certain specified time—but these details of preliminary procedure, indispensable to the fixing of uniformity in the administration of the law, were not and are not merged in the essential thing itself; they constitute no part of the claim to citizenship in the nation. It is simply the mode and method prescribed by which the Mississippi Indian may avail himself of the benefits granted him by Congress in fixing his right of citizenship. By no possible means can it be said that money expended for the removal of from 20 to 60 individual Indians to the Territory redounded to the general benefit of the Mississippi Indians as a class. While it is true they must remove to acquire the right, yet to bring a claim against the class it must affirmatively appear that the service rendered and funds expended benefited all the class alike. The claim for removal is an individual one; it can not be otherwise. Some claimants transported their Indians in box cars, others afforded their clients Pullman sleepers, while still others housed the Indians in temporary shacks, one delegation enjoying the luxury of quarters at local hotels. The Government expended $20,000 in the removal and subsistence of quite a number, and doubtless not a few provided their own means of transportation at their own expense. Certain it is that no one claimant or class of claimants transported all the Indians enrolled or expended sums which come within the range of any rule of uniform expenditure or reasonableness in amount.
All these sums of alleged expenditure occurred subsequent to the acquirement of the right of citizenship and are incidental only to that right. It was personal service rendered to the individual Indian, moneys advanced and *304 expended for his personal benefit, and not a claim recognized by Congress as one chargeable against the Indian lands. In addition to what has been said, it would be an absolute impossibility to reconcile the mass of confusing and contradictory testimony respecting this very subject and decide from the records what would be a reasonable charge for this service. It is beyond question that many individuals repaid some claimants for the moneys advanced for this purpose. Possibly many more, if permitted to do so, could prove a similar payment. It is inconceivable that Congress intended to reimburse claimants for the funds thus alleged to have been expended and provide no means of defense for the individual Indian charged. On the contrary, the very absence of any provision for individual defense and representation upon the part of the individual Indian manifests an indisputable intention to limit the jurisdiction of the court to an ascertainment of services rendered and expenses incurred which accrued alike to the Indians as a distinct entity and capable of being equitably apportioned among them.
The claim of Charles F. Winton, as we now consider it, is predicated upon alleged services rendered the Mississippi Choctaws in conjunction and association with Robert L. Owen, Preston S. West, Walter S. Logan, deceased, Frank B. Crosthwaite, and John Boyd. West, Logan, Crosthwaite, and Boyd prefer no individual claim; in fact, file no individual petitions. Whatever sums they may be entitled to receive are to be paid them by Messrs. Owen and Winton.
The findings show that in June, 1896, following the act of June 10, 1896, 29 Stat. L., 321, which conferred jurisdiction on the Dawes Commission to make a roll of the Choctaw Indians, Winton and Owen entered into a written arrangement by the terms of which Winton was to proceed to Mississippi and procure from the Choctaw Indians residing there as many contracts as possible, employing said Win-ton to represent them in securing their rights to enrollment in the nation. Winton was to do the manual labor in this respect and Owen was to bear the expense incident thereto, the profits, if any,' to be shared equally. This partnership *305 agreement was subsequently modified to some extent, but the modifications are of minor importance. Winton went to Mississippi immediately after tbe conclusion of the agreement and at this time secured about 1,000 individual contracts with full-blood Mississippi Choctaws, the Indian agreeing to compensate said parties by the payment of a fee of one-half of the net interest of his allotment when the same was secured. All of these contracts were expressly invalidated by the act of May 31, 1900, supra.
In June, 1901, Winton and Owen having previously submitted to an eminent firm of lawyers the question of the validity of the first contracts taken by them, in view of the act of May 31, 1900, and having received an adverse opinion thereon, together with suggestions and advice as to how to proceed in the premises, abandoned the earlier contracts and secured 834 additional contracts providing for a compensation for services equal to one-half the value of the net recovery of or for the Indians in land, money, or money values. The last contracts embraced a total number of at least 2,000 Indians.
In the meantime, however, Owen early in 1896 had called the attention of Hon. John Sharp Williams, then a Representative in Congress from the district where the major portion of the Mississippi Choctaws resided, to the possible rights of his constituents to participate in the allotment of Choctaw lands in the West, at the same time furnishing him with a copy of the treaty of Dancing Rabbit Creek and directing his particular attention to the fourteenth article thereof. Williams up to this time had taken no interest in the matter.
Winton had likewise been industrious in December, 1896, January, 1897, and September, 1897. On each of these occasions he presented printed memorials to Congress directing attention to the rights of Mississippi Choctaws in the Choctaw Ration under the fourteenth article of the treaty. These petitions to Congress are significant in that they put forth a contention for the right of the Mississippi Choctaws to participate in the allotment of Choctaw lands on the theory that by the terms of the treaty the Mississippi Indians *306 had bought and paid for two things—the right of residence in Mississippi, and of not losing the right of citizenship in the nation because of such residence.
In October, 1896, Owen applied to the Dawes Commission for the enrollment of Jack Amos and 97 other full-blood Mississippi Choctaws whom he represented under the contracts heretofore described. The contention advocated for their enrollment was rested on the act of June 10, 1896, supra, and involved the question of removal from Missis sissippi to the Indian Territory, Owen insisting that removal was not necessary. The commission declined to enroll his clients, which ruling was subsequently affirmed on appeal to the United States court for Indian Territory, the case later going to the Supreme Court, where it failed of consideration upon jurisdictional grounds, being, however, indirectly affirmed in the case of Stephens v. Cherokee Nation, 174 U. S., 445.
In February, 1897, Owen drafted a resolution, which was subsequently passed by the United States Senate, calling for certain information from the Interior Department relative to the contemporaneous proceedings between the Choctaw Indians and the representatives of the United States occurring at the time of the negotiation and execution of the treaty of Dancing Babbit Creek. The information was promptly furnished and was at all times easily accessible and well known to those charged with the administration of Indian affairs.
In June, 1897, Congressman Williams secured the legislation directing the Dawes Commission to investigate the claims of the Mississippi Choctaws, 30 Stat. L., 83. Thereafter Owen appeared before the commission in the interests of his and Winton’s clients. Nothing more was done by the claimants until subsequent to the passage of the act of June 28, 1898, known as the Curtis Act. It will be recalled that this legislation authorized the identification of Mississippi Choctaws who had removed to the Territory, and was the result of Congressman Williams’s efforts in their behalf. Following this Owen, through Winton, prepared a circular, and it was generally circulated among the Indians, pointing *307 out the requirements of the Curtis Act and advising them as to how they might be identified. The circular was, of course, unofficial and was later substituted by the official action of the commission, by which it publicly advised the Indians of the time when and place where the commission would sit to receive applications and the mode of procedure and requirements for enrollment. It will be recalled that Commissioner McKennon proceeded to Mississippi to execute the orders of the commission, and after he arrived there his labor and progress was interfered with and considerably retarded by the interference of Winton and others on the ground, who persistently and industriously delayed and confused the Indians by solicitations for contracts of employment to represent them before McKennon and elsewhere. This fact was emphasized in the report of Commissioner McKennon and is fully sustained by the record.
Neither Winton nor any other claimant, so far as the record discloses, made objections to the McKennon roll, nor were they in anywise instrumental in its final disapproval, although it was manifestly erroneous and inaccurate. In fact, Winton, on February 7, 1900, addressed a memorial to Congress which, in effect, approved the principles adopted by McKennon in making up his roll. Congress disregarded the petitions of Winton, and it was apparent to all concerned that the removal of the Mississippi Indians to the Territory would be made an indispensable prerequisite to the securement of citizenship. So we find, for the first time, on April 4, 1900, Winton and his associates suggesting legislation embodying the idea of removal. The act of May 31, 1900, heretofore adverted to, provided for removal, but its passage is in nowise to be accredited to the service of any of the claimants. It was due wholly to the efforts of Congressman Williams and his colleagues in both House and Senate. This is obvious from the last clause of the statute, which expressly invalidated all contracts with the Mississippi Indians and freed their funds and lands from any charge alleged to have been incurred by them in reference thereto.
That Winton and his associates yielded reluctantly to the policy of removal and the expense incident thereto is evi *308 denced by the incorporation of the Choctaw Cotton Co. This company was incorporated under the laws of West Virginia for the purpose of financing the removal of Mississippi Choctaw Indians to the Territory. All the contracts of Winton and his associates were assigned to the company. They were the company’s only assets. Two-thirds of the capital stock was issued to Owen and one-third to Winton, and the same was placed upon the market, possessing no value aside from the anticipated returns from the assigned agreements.
The purpose and intention of Congress by the passage of the act of May 31, 1900, as we have previously shown, miscarried, and other legislation became necessary. The final legislation, which culminated in the recognition of the rights of citizenship as embodied in the act of July 1, 1902—i. e., the ratification of the Choctaw-Chickasaw supplemental agreement—was drafted by one McMurray and Assistant Attorney General Van Devanter. It was inimical to and opposed by Winton and associates, and their suggestions and memorials in reference thereto were opposed by the Interior Department and the Congress of the United States.
Winton and other claimants, as will hereafter appear, seriously interfered with, obstructed, and retarded the work of the second commission sent by the Dawes Commission to Mississippi in April, 1901, not only by their never-ceasing efforts to procure contracts of employment but by direct and express professional advice not to appear before the commission for enrollment, as it was without power or authority to enroll them.
The court, by the foregoing, has segregated the claim of Winton and his associates, made necessary by its close relationship and interlacing with the various legislative enactments in the course of this litigation, set forth in chronological order in the findings. No claim is made by Winton and his associates for any expenses incurred, the petition in this respect confining its allegations to a right of recovery for services rendered in procuring legislation, services before the committees of Congress, the Interior Department, and the Dawes Commission.
A close analysis of this particular claim in view of the principles upon which we are to award judgment found in *309 the jurisdictional acts results in a conclusion adverse to its allowance. The most conspicuous service rendered, treating the same now wholly upon its merits, was the suggestion made by Owen to Williams in 1896 relative to the treaty rights of the defendant Indians. It was as aptly styled by Senator Williams “ the suggestion of an idea,” and had the suggestion been followed by continuous service in harmony with and helpful to the efforts subsequently put forth to secure the adoption of the legislation procured, it would have been of great monetary value to the final beneficiaries. Unfortunately for the claimants, however, the record discloses an advocacy upon their part of legislation in direct opposition to the attitude of the department and Congress— an opposition of sufficient force to delay, confuse, and retard what was the obvious desire of both the Choctaw Nation west, the Indian Office, and the Congress in the speedy and just settlement of this Indian contest. It is not for the court to say whether Winton and his associates were right and the other side wrong. We are alone concerned with what was done and who brought it about. Senator Williams expressly disclaims any subsequent assistance from Winton, his associates, or any other of the claimants in what he did, and repudiates the idea of any influential efforts in the accomplishment of the laws passed. As a rule, and speaking from the record, the court may well say that Win-ton and his associates’ services before the committees of Congress, the Interior Department, and the Dawes Commission were not the moving cause or the paramount reason for the course finally pursued. The initiatory service set in motion the machinery of legislation; the final product, however, was the conception and labor of others, so that in the end the real substantial factor, the laws which accorded citizenship, the vital matter requiring service, and professional service of a high character, was not the result of cliamants’ efforts. Winton himself was most of the time assiduously engaged in negotiating and procuring contracts of employment from the Indians. His zeal in the cause frequently led him into open conflict with the authorities of the Dawes Commission in Mississippi, which materially injured the Indians’ rights. He was in fact in no position *310 to render extensive or convincing service to the legislative branch of the Government and followed precisely the course of his associates. The memorials prepared and signed by Winton individually are shown to have been devoid of influence by contrasting their subject matter with the legislation enacted.
Aside from the merits of the claim it would be impossible to award a judgment in favor of Winton and his associates and conform to the opinion of the court. Winton and his associates were, during the whole course of this controversy, discharging their obligations to the Indians under their individual contracts; they were representing Choctaw Indians, with whom they had individual contracts and endeavoring by their efforts to secure for them the greatest possible rights, both individual and property, in the Choctaw Nation as Congress might grant. Winton and his associates were advocating with ability and great earnestness a right accruing to the Mississippi Choctaws under the treaty of 1830 to remain in Mississippi and at the same time enjoy the benefits of Choctaw citizenship in the Nation. This was a contention designedly assumed for the express benefit of their individual clients and for which they expected them and them alone to pay compensation. It was a service performed for and in the interest of a certain number of Mississippi Choctaw Indians without the knowledge or acquiescence of a large portion of the class with whom they had no contracts, and for whom other claimants were performing service of a very distinct and different character.
The jurisdictional act does not dispense with the necessity of proving a service of such a general character as to redound to the benefit of all the Indians alike; nor does it relieve the claimants or the court from the burden of detail investigation into the origin, progress, and result of the service for which compensation is claimed. It would be extending the doctrine of an implied contract to pay for services rendered, which may produce beneficial results, to the limit to hold that services performed in the interest of a part of the Mississippi Choctaws imposes the burden upon a large portion of the tribe, totally disconnected in *311 every way from any association with the claimants, of contributing toward payment therefor. Can it be said that because a certain class availed themselves of legislation advocated by claimants they thereby impliedly promised to pay them for services when the record discloses that these very beneficiaries were under contract to pay other claimants for doing the same thing? Supposing some of the Indians, as doubtless some did, had paid their attorneys, must they again respond for a service of which they knew nothing and which they never requested? It is impossible from the testimony to bring home to the large class sought to be charged with expense a common knowledge of what the claimants were doing, or to place them in a situation from which such knowledge may be inferred. The claimants attempt this by the simple introduction of their contracts of employment, supplemented by proof of what they did, apparently resting their case upon the theory that service to a portion of the class was made by the jurisdictional acts equivalent to service for all. To sustain a recovery upon the principle of quantum meruit there must be more in the record than a mere acceptance of benefits made available through the efforts of claimants to serve a particular class of the whole class in virtue of written contracts so to do. In a claim like this the principles of quantum meruit apply to the persons obligated to pay therefor by the written contracts which have been invalidated by law, but it can not extend to a large number of persons who were wholly innocent of any work or labor being done for them with the expectation of compensating others than those whom they employed therefor.
A judgment upon the principles of quantum meruit presupposes a situation of the parties whereby the court may infer from the circumstances of the case that the defendants knew of the efforts in their behalf, acquiesced in the performance of labor for their benefit, accepted the benefits of such services, and thereby impliedly promised to pay therefor. In this case not only these claimants but all others have failed to do so. They have shown an individual employment, in some instances extensive, in others limited, *312 each acting within his own sphere absolutely without concerted effort or personal affiliation an'd association. No one was attempting to serve all the Mississippi Choctaws; no one was attempting to do more than secure the enrollment of their individual clients regardless of the rights of others, and frequently at cross-purposes with each other.
In addition to what has been said, it is absolutely impossible from the record in this case to ascribe to any of the claimants the credit for securing legislation. The Congress acts deliberately, and information respecting matters of legislation is usually found in the several departments of the Government. In Indian affairs a separate branch of the Department of the Interior has been established by law with full jurisdiction over the administration of Indian affairs. The records of this department are reliable and trustworthy, and when Indian affairs engage the attention of Congress the Indian Office is called into consultation, and from its archives official documents supply information forming the basis of Indian rights, both personal and property. It would be a task impossible of performance to segregate the services of these claimants from the influence of the department’s efforts in the adjustment of this controversy and say that the claimants exerted an influence that moved Congress into a recognition of the Mississippi Choctaw Indians’ rights to citizenship. The usual course of legislation negatives the contention in the very beginning.
We do not hesitate to say that we have ignored a contention made in the case upon behalf of attorneys generally that looks to an award of $2,000,000, or 15 per cent of the value of the Indians’ estate. This is not a suit susceptible to such an advocacy, and it was unwise to encumber the record with proof of such character. The whole argument predicated upon such a basis in no wise tends to help the court in its deliberation and certainly tends toward a conclusion that the whole transaction from its inception to its close was intensely speculative in its character and devoid of the usual and customary relationship that should always obtain between attorney and client in that the former is always charged with the duty of protecting and conserv *313 ing Ms client’s interest and property. We venture the assertion that not one of the "claimants here concerned but would have gladly accepted employment in this whole matter on a basis of compensation in no wise comparing to the absurd figures noted above.
The claim of Chester Howe, deceased, is, on its face, devoid of merit. It is a claim against Hudson & Arnold and James E. Arnold. Howe traces absolutely no employment by or knowledge to the Indians that he was acting in their behalf. There is nothing in the record to even suggest such a relationsMp between Howe and the defendants that would warrant the court in implying a contract upon their part to recompense him. Howe was employed in 1899 by one L. P. Hudson, a member of the firm of Hudson & Arnold, to represent said firm as an attorney at law before the committees of Congress, the Indian Office, and the Dawes Commission. He was never substituted as an attorney by Hudson & Arnold or James E. Arnold under their contracts. James E. Arnold subsequently renewed said contract after the dissolution of the firm of said Hudson & Arnold. Howe’s compensation was a contingent fee based upon one-third of the amount stipulated as compensation for the aforesaid firm in their contracts with the Indians, accompanied by an assignment to this extent of an interest in the same.
That Howe never considered the Indians as liable for his fees is more than evidenced by the fact that he was on the point of withdrawing from the whole case because Hudson & Arnold had refused to pay him his proportion of certain money collected on the contracts in which he had a one-third interest. Howe, in so far as this record is concerned, never saw a Mississippi Choctaw Indian. He advocated their cause, it is true, and he did it with great faithfulness and signal ability, but he was acting in behalf of his clients, Hudson & Arnold. It would be an act of great injustice to charge the defendants with the payment of an attorney’s fee for services rendered by an attorney without their knowledge or consent, and who at the time of acting was under contract with other clients who promised to pay him. The court can not consider the failure of Howe’s clients to pay him as an *314 evidence that Congress intended to have the Indians answer out of their estate for this default. Howe’s petition will be dismissed.
Page on Contracts, volume 2, section 774, states with such precision the elements of an implied contract that we give the language in full:
“ If the person for whom services of a kind usually made the subject of charge are rendered knows of their rendition, he is liable therefor, though he has made no express request, in the absence of special circumstances, negativing his liability. If the person for whom the work is done knows that it is being done and that the person doing it expects compensation from the person for whom it is done, and believes that such compensation will be made, and the latter does nothing to correct such impression, he is liable for the work thus done. In the absence of an express previous request it is necessary that the person for whom the work is done should know that it is being done, and further that it is being done for his benefit and also upon his liability. If A employs B to do certain work and B employs C to aid him therein, no implied contract between A and C exists, even if A knows that C is doing the work and that A will ultimately receive the benefit thereof, since A is liable over to B on his contract for the work done.”
Balston & Siddons were employed by Howe, and Howe agreed to pay them. They had no direct relationship with the Indians, and their appearance was without the Indians’ knowledge or consent. This petition will also be dismissed.
We next reach the claims of James E. Arnold and Louis P. Hudson. They might each be disposed of very briefly, if it were not for the employment by them of Chester Howe, as heretofore noted. Arnold was not a lawyer, and hence incapable of performing professional services; Hudson was an attorney at law, but proves no professional service. Arnold’s principal claim is predicated upon expenses incurred in the removal of the Indians. Claims of this character we decline to recognize, leaving Arnold dependent upon recovery to the services rendered for him by Howe. Arnold collected thousands of dollars from the Indians, and from the inception of his participation in Choctaw affairs to the close of the whole transaction profited perhaps more than all other claimants combined. He agreed to compensate Howe, and unquestion *315 ably had sufficient funds on hand to more than pay his attorney all his services were at least reasonably worth.
Hudson’s petition follows Arnold’s and will be dismissed.
The claim of the intervenors is a distinct entity—i. e., the claimed relationship must be sustained as sufficient to constitute an association within the meaning of the jurisdictional acts, and is attempted to be so connected that a recovery thereon inures to the individuals only on the theory of the worth of their combined efforts. While each file individual intervening petitions the allegations of the same disclose a claimed liability upon a concerted or copartnership effort each contributing in his own way a portion of the combined effort. It is novel, especially so in view of the fact that liability against the defendant Indians is asserted, not upon any contract or relationship with them direct, but wholly upon an independent agreement or agreements among themselves as to the division of fees between them by M. M. Lindly, who alone alleges an express contract with the defendants. Field says he is entitled to be paid because he collaborated with Lindly and Howe under an express contract between the trio and that any fees accruing should be divided. He further alleges an interest in all the services rendered by James E. Arnold, Louis P. Hudson, and John London under an agreement which the above-named persons are supposed to have made with Lindly, which, by the terms of the Lindly, Field, or Howe agreement, above mentioned, was to inure to the benefit of this copartnership, although it nowhere appears that Arnold, Hudson, or London were parties to the alleged written instrument creating the coparnership. Whatever interest they had in the alleged firm was never disclosed until the institution of this suit, and not one of the intervenors, even under the band contract which is claimed as being in Lindly’s name, except Lindly, connect themselves in the remotest way with the defendant Indians. Lindly and London attempt in oral testimony to corroborate Field in every important particular. The alleged written contract of copartnership between Field, Lindly, and Howe is attempted to be established by a copy of the same. The court discards it, for *316 Howe was dead when it was first produced and his signature does not appear thereon, and no effort is made and does not appear to have ever been made to bind Arnold, Hudson, or London to the agreement in writing; and inasmuch as Arnold directly contradicts and Hudson prefers no claim thereunder, furnishing no proof thereof, this phase of the association is left alone upon the unsupported testimony of Field and Lindly. It would involve a discussion much too prolonged to analyze and point out in detail the manifest inconsistencies appearing in the testimony of these three intervenors. The record is replete with sustained charges of personal and professional misconduct. The court has been amazed at the strenuous effort put forth in an endeavor to erect a claim of sufficient stability to come within the limits of the jurisdictional acts. We have gleaned with the greatest care and after the most careful and deliberative consideration the facts set out in the findings from a record so decidedly discredited and equivocal that we have been unwilling to attest a single circumstance claimed unless corroborated by the testimony of living witnesses, other undisputed circumstances of the transaction, or confirmed by authentic written papers and the contemporaneous history of the whole transaction.
Lindly, Field, and London delayed an assertion of their individual and copartnership claims against the defendant Indians until long after all the other claimants had filed their petitions and much testimony taken in reference thereto. All were entirely familiar with the proceedings and knew the entire course of the pending controversy; Field particularly so, for he had personally represented three of the intervenors. This circumstance is obviously potential, its influence especially convincing, in giving weight to the voluminous testimony presented in support of the claims. Standing alone it is clearly susceptible of explanation. In the absence of such an explanation, however, it must incur the penalty of arousing doubts in reference to the proof of important events which, had the claims been promptly asserted, could have been easily proven by living witnesses, which now, through the lapse of time and the negligence *317 of the claimants, depend upon secondary evidence incapable of being contradicted by the witnesses in behalf of diverse interest directly concerned because of their death.
The claim as predicated upon the alleged band or tribal contract is preposterous and absurd. No doubt Lindly and Field hoped to secure the execution of such a contract and doubtless drafted and delivered to London such an instrument in form. In order to prove its execution,these claimants present a record wherein London himself so thoroughly discredits the whole transaction, and is so fully corroborated by well-known and existing conditions among the Choctaw Indians in Mississippi that the whole attempt falls of its own weight.
To prove the contents of a lost instrument something more is required than merely a trace of its possession from one to another of the intervenors. The execution of the original can not be sustained by a simple recitation of individual opinion respecting its acknowledgment by those especially interested in sustaining the same. Not a single witness is produced to identify the signatures of the alleged parties thereto, when, before whom, and in what manner or even the capacity or authority of the officer in Mississippi before whom it is alleged to have been taken. The whole transaction is entirely too indefinite, too much is left to inference and conjecture, too many implausible and contradictory statements with reference thereto abound, to warrant the court in the light of the long history of the life and local conditions of the Choctaw Indians in Mississippi to attach weight to an alleged contract of this character.
From a legal aspect the claim must fail. Field, Lindly, and London can not by a copartnership agreement bind the defendant Indians to pay them for professional services which they never engaged them to perform. It is a startling proposition to contend that because Lindly, Arnold, or Hudson had a contract or contracts with the Mississippi Choctaw Indians, and in the performance of the same employed Field to assist them, that thereby the defendants incurred a liability to pay attorney fees to not only their contract attorneys but to all with whom they might thereafter *318 associate". Lindly, London, and Field never prepared, signed, or presented a brief to the committees of Congress over their own names. Aside from Field’s activity in interviewing personally some individual Congressmen and United States Senators, for which service he could not recover, not one of them had the slightest direct connection with the defendants, except as to some individual contracts taken by Lindly and London. The Congress did not intend by the use of the term “ associates ” to extend a right to prefer a claim against the defendant Indians because perchance the personal relationship between Lindly, London, Field, and Chester A. Howe was congenial and agreeable. These three claimants can not by an agreement between themselves enhance the cost to the defendant Indians for professional services for the performance of which the Indians engaged one of their number to perform. Even if the band and co-partnership contracts were fully proven and established, except as to the individual beneficiary thereunder, no possible right of action could accrue. The Indians did not employ the intervenors; they did not even suggest their employment or know of it. The activity by them manifestly was in pursuance of an undérstanding among the intervenors to which the Indians did not accede and with which they had no concern. It was an express agreement, inter alia, by the terms of which Lindly agreed with the remaining intervenors to share with them a proportionate part of fees due him under his contracts with the Indians. The Congress was not making contracts for the intervenors or erecting a relationship out of which every Indian attorney who voluntarily or otherwise connected himself with another actively and properly engaged in urging the defendants’ claims before the various departments of the Government, could come in and claim a personal liability to him. The defendants were not exposed to such unlimited liability. The term “ associates ” must be read in connection with principles upon which we are to award judgment—“principles of quantum meruit.” An associate to recover can not rest his case upon a mere contract of association with an attorney regularly employed by the defendants. He must do more; he must assume the burden of establishing a service under *319 such circumstances and so connected with the defendants that the court can imply a contract upon the defendants’ part to pay what those services are reasonably worth. We have heretofore discussed the question under individual contracts and sums expended for removal which we need not again repeat. Suffice it to say that not a single one of the intervenors have established the slightest vestige of authority to represent the defendant Indians, Field himself never having procured a contract in his own name of any kind or character; and the mere fact, if it was established, that he may have been engaged by Chester A. Howe to assist him professionally in his presentation of the case, could under no circumstances give him more than a claim against Howe for the payment thereof.
The claim of James S. Bounds is for services distinctly personal. Nothing that he did resulted in any permanent or temporary benefit to the Mississippi Choctaws as a class. His petition will be dismissed.
The petitions of William N. Vernon, Joseph W. Gillett, Choctaw-Chickasaw Lands & Development Co., J. J. Beck-ham, and David C. McCalib are all for personal services rendered for and on behalf of individual Choctaw Indians and all were rendered after the passage of the act of July, 1902. They had no part in the solution of the Mississippi Choctaws’ claim to citizenship in the Choctaw Nation. The whole transaction of each petitioner and intervenor mentioned above was entirely speculative and personal. All the above petitions are dismissed.
Thomas B. Sullivan and Joseph H. Neill have a claim against the estate of Charles F. Winton, but none against the defendants. Their petitions are dismissed.
The remaining petitions of Melvin D. Shaw, James O. Poole, and John W. Toles are all dismissed for lack of sufficient proof to sustain them.
It is so ordered.